# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

LORI PANARELLO,

       *Plaintiff*,

    v.

Civil Action No. 12-1966 (RDM)

RYAN ZINKE,[1] *Secretary, United States Department of the Interior*,

       *Defendant*.

## MEMORANDUM OPINION

Plaintiff Lori Panarello, a lieutenant in the National Parks Police, brings this Title VII action against the Department of the Interior, the parent agency of the Park Police. She alleges that she was denied training, leadership opportunities, awards, and "promotions within her agency" based on her sex and her participation in protected equal employment opportunity ("EEO") activity. She further alleges that this same discriminatory and retaliatory conduct created a "hostile work environment." The Interior Department initially responded to her complaint with a Motion to Dismiss and for Summary Judgment. Dkt. 12. That motion asserted that Panarello failed to timely exhaust administrative remedies with respect to most of her claims and that, with respect to the claims that she did exhaust, the Department's actions were taken for legitimate, non-discriminatory and non-retaliatory reasons. *Id.* Panarello opposed the Department's motion on the merits but also argued that the motion was premature and that she should be permitted to take discovery pursuant to Federal Rule of Civil Procedure 56(d) before responding. Although a close question, the Court (Lamberth, J.) agreed that the Department's

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Ryan Zinke is substituted as the official-capacity defendant.

motion was premature and that discovery was warranted. *See* Dkt. 23 at 5. The Court, accordingly, denied the Department's initial motion without prejudice and set a discovery schedule.

After approximately a year of discovery, the Department has renewed its Motion to Dismiss and for Summary Judgment. Dkt. 39. That motion reasserts the two defenses raised in the Department's original motion, this time with the benefit of a factual record. The Court is now in a position to decide the Department's motion, and, for the reasons discussed below, it will grant the motion and enter judgment in favor of the Department.

## I. BACKGROUND

### A.      Factual Background

Because Panarello is the nonmoving party, the Court views the evidence in the light most favorable to her. *See Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011).

 Panarello has been employed by the National Park Police as a law enforcement officer since 1991. Dkt. 39-19 at 3. At the time she filed suit, she held the rank of Lieutenant (Grade 5). Dkt. 39-1 at 1. Early in her career at the Park Police, Panarello served as a witness in an EEO proceeding involving allegations of sexual harassment committed by another Park Police officer, Sergeant William Wolz. Dkt. 39-19 at 5. That administrative proceeding eventually led to a lawsuit, which Panarello and five other female Park Police officers brought against the Department in 1998. *See* Complaint, *Sabate v. Babbitt*, No. 98-cv-929 (D.D.C. Apr. 14, 1998), ECF No. 1. In the 1998 lawsuit, Panarello and the other plaintiffs alleged that Wolz, who worked with them at the Park Police's Glen Echo Substation, "subjected them to gender discrimination and sexual harassment on a continuing basis." *Id.* at 7. The 1998 complaint also alleged that Wolz "imposed unwarranted discipline on the [p]laintiffs," "made unsubstantiated

2

complaints against them," and threatened retaliation when they complained about his behavior. *Id.* at 9. With respect to Panarello in particular, the complaint alleged that she was "warned" by another officer that "she would have no career at" the Glen Echo Substation. *Id.* at 12.

David Stover, who was then a lieutenant in the Park Police, "was the station commander and[,] as such, had responsibility for overseeing the operations of the station and directly supervising the sergeants," including Wolz. *Id.* at 6. According to the 1998 complaint, after "Wolz was removed from duty, . . . Stover continued the[] campaign of retaliatory actions against the [p]laintiffs in an effort to force them to withdraw their EEO complaints." *Id.* at 14. Among other things, he allegedly "told [the] [p]laintiffs that he was upset that they had not gone to him with their problems and accused them of trying to get rid of" another sergeant "'the way they got rid of . . . Wolz.'" *Id.* In front of other officers, Stover allegedly "accused the [p]laintiffs of acting to 'tear the substation apart' by pursuing their EEO complaint," and he allegedly told two of the plaintiffs "that their allegations of discrimination had undermined his career" and "warned them against filing claims against other officers." *Id.* Although the 1998 complaint does not specify which plaintiffs were targets, it asserts that Stover "engaged in numerous retaliatory actions," including bringing "an unfounded complaint," assigning the plaintiffs to "undesirable and inconvenient shifts," "attempting to bar one [p]laintiff from an assignment she had requested in Virginia," and "attempting to solicit complaints against [p]laintiffs." *Id.* Finally, the 1998 complaint alleged that, as a result of the asserted discriminatory and retaliatory conduct, "Panarello transferred" from the Glen Echo Substation "to the Greenbelt, Maryland Substation." *Id.* at 15.

Ultimately, the 1998 lawsuit resulted in a settlement in which the Department agreed to make a substantial monetary payment, to provide Panarello certain training, to "expunge the

documentation regarding" a disciplinary proceeding brought against her, and to promote Panarello to sergeant within 120 days of settlement. *Sabate v. Babbitt*, No. 98-cv-929 (RCL), (D.D.C. Aug. 14, 2000), ECF No. 36. As required by the settlement, Panarello was promoted to sergeant in 2000 or 2001. Dkt. 39-1 at 1; *see also* Dkt. 39-19 at 8 (Panarello Dep. 26, 27) (promoted in 1999 or 2000). She was further promoted to lieutenant in 2004. Dkt. 39-6 at 21.

Panarello's current complaint focuses on mistreatment that allegedly occurred many years later, starting in 2009. That mistreatment, however, allegedly had roots in Panarello's earlier protected EEO activity. Dkt. 1 at 2 (Comp. ¶ 13). She contends, for example, that Stover continued to hold a grudge against her and that, at some point after he was promoted to deputy chief, Stover and another deputy chief, Jeanne O'Toole, instructed Panarello's captain not to give her an evaluation rating above a three, on a scale of one to five. Dkt. 39-19 at 13–14 (Panarello Dep. 47–50). She also contends that, unlike other equally or less qualified officers, she was denied several opportunities to receive special training and assignments—including the opportunity to attend "the FBI Academy" in September, 2009, Dkt. 1 at 5–6, and assignment to the "SWAT K-9" and "Aviation" teams, Dkt. 41-1 at 3, 4 (Panarello's Statement of Facts ¶¶ 24, 31)—and that she was not "included in an award for a barricade incident in which she was involved," Dkt. 1 at 6. This pattern of discrimination and retaliation reached its pinnacle in 2009 and 2010, according to Panarello, when the Park Service took disciplinary action against her and declined to promote her to the rank of captain and rejected her application for two command positions. *Id.* at 6–8.

The disciplinary matter arose from an early-morning car stop near the Jefferson Memorial on April 11, 2008. According to a "Notice of Proposed Demotion" issued following an investigation into the incident, the accuracy of which Panarello does not dispute, officers under

Panarello's supervision stopped a vehicle approaching the Jefferson Memorial slightly before 3 a.m. on April 11, 2008, and ordered the occupants out of the vehicle. Dkt. 39-23 at 2. When searching the trunk of the car, one of the officers "discovered a . . . dildo," and another officer removed it from the trunk and gave it to Panarello, who was at the scene of the stop. *Id.* at 2–3. Panarello then "placed it on top of the vehicle" and called another officer to the scene "to take pictures." *Id.* at 3. The officer Panarello originally called was unable to attend, but he directed another officer to the scene in his place. *Id.* At Panarello's request, that officer then took pictures "with his personal cell phone" while another officer "laugh[ed] about" the device and engaged in "distasteful shenanigans." *Id*. The remaining officers at the scene simply looked on, "embarrassed by [Panarello's] actions to condone such behavior, particularly in the same vicinity of the . . . occupants" of the vehicle the Park Police had stopped and searched. *Id.*

On August 2, 2009, while the Jefferson Memorial incident was under investigation but before any disciplinary action was proposed or finalized, Panarello applied for promotion to captain. Dkt. 39-6 at 2. At that time, applications for promotion to captain were assessed on a 100-point scale, with fifty points assigned to the candidate's performance on a battery of exercises at an "assessment center" and fifty points assigned to an assessment of the candidate's "Knowledge, Skills, and Abilities (KSAs)." Dkt. 39-5 at 3, 5. The applicable rules also provided that "any disciplinary/adverse action certified by the Commander, Office of Professional Responsibility" for the two years preceding the closing date for the vacancy announcement would be "negatively reflected in the overall score of a candidate's KSAs." *Id.* at 4. Disciplinary incidents that were under investigation, however, were not considered in promotion decisions. Dkt. 39-22 at 9 (Lauro Dep. 32).

The "assessment center" portion of the evaluation was conducted at an external testing center, and none of the assessors were Park Police employees. Dkt. 39-18 at 3 (Lauro Decl. ¶ 8). The KSA portion of the evaluation was scored by Park Police officers at the rank of captain or above. Dkt. 39-5 at 3. Panarello does not allege that Stover was on the panel that assessed her KSAs, and Stover retired in September 2008, almost a year before Panarello applied for any of the captain-level positions at issue. *See* Dkt. 41-4 at 5. Candidates who completed both portions of the assessment were rated either "Well Qualified" or "Qualified," and listed on a "promotion roster" in alphabetical order without scores. Dkt. 39-5 at 5. When a captain-level position became vacant, lieutenants on the promotion roster could apply for the position. *Id.* at 6. Salvatore Lauro, Chief of the Park Police at the time, was the selecting official for the captain-level vacancies for which Panarello applied. Dkt. 39-9 at 4. His selection policy was that, "[i]f a 'Well Qualified' candidate applied for a posted Captain position, [that candidate] had an absolute preference over a candidate in the 'Qualified' list." Dkt. 39-18 at 3. Lauro and his command staff "use[d] the natural break in the scores" to separate "Well Qualified" from "Qualified" candidates, such that "if there is a bunch of people between 80 and a hundred and then there is a gap from 80 to 70 and then you have another group of people from 50 to 60, the natural break would be that 60 to 70." Dkt. 39-22 at 9.

Panarello scored below average at the external assessment center. Her total score on the external assessment was "23.800," compared to an average score of "28.2754." Dkt. 39-6 at 23. The highest scoring candidate received a score of "39.1714," while the lowest scoring candidate scored "19.1143." *Id.* Panarello's score on the KSA portion of the assessment is not in the record before the Court. Overall, Panarello was one of five lieutenants listed as "Qualified" on the promotion roster; twenty were listed as "Well Qualified." Dkt. 39-8 at 2. Lauro attested in

the course of the administrative EEO investigation that Panarello "was rated near the bottom of the list (24 out of 25 candidates) by the assessors." Dkt. 39-9 at 4. Several captain-level vacancies were filled in 2009 and 2010 from the promotion roster; Panarello applied for all of them, but was not selected for any of them. Dkt. 39-11 at 2, 4, 6, 9. All of the officers selected were on the "Well Qualified" list. *Compare* Dkt. 39-8 at 2 (promotion roster) *with* Dkt. 39-11 at 2, 4, 5, 8 (selection notices).

On October 22, 2009—more than eighteen months after the Jefferson Memorial incident—Panarello received her proposed discipline. Citing Panarello's "[f]ailure to act appropriately as a manager" and "[d]ereliction of duty," Deputy Chief Jeanne O'Toole proposed to demote Panarello from lieutenant to sergeant. Dkt. 39-23 at 2–4. Panarello appealed the proposed demotion to Assistant Chief William Lynch, who decided to reduce the penalty to a fourteen-day suspension, principally due to the delay between the events at issue and the completion of the disciplinary process. Dkt. 39-23 at 12; Dkt. 39-24 at 3, 9. Lynch issued the suspension on January 22, 2010. Dkt. 39-23 at 9. Panarello filed a grievance with Lauro on February 8, 2010, challenging that decision, but nonetheless served the suspension between February 21 and March 6, 2010. Dkt. 39-23 at 15. Lauro denied the grievance on December 15, 2010. *Id.*

On April 20, 2010, Panarello was not selected for two "command positions" for which she had applied. Dkt. 39-3 at 5. The first position was to serve as a "SWAT/K-9" commander, and the second was to serve as an "Aviation" commander. *Id.* Both positions were apparently at the lieutenant level, and thus did not involve promotion to captain. *See* Dkt. 41-1 at 3 ("SWAT K-9 and Aviation would have been considered specialized assignments."); Dkt. 41 at 18 (noting that specialized assignments "would improve [Panarello's] promotion potential"); Dkt. 39-10 at

4 (describing "SWAT-K-9" and "Aviation Commander" as "lateral voluntary transfer position[s]"). And, unlike with the captain-level positions, "[a]ny interested [l]ieutenants" could apply without the additional "paperwork" required for promotion to captain. Dkt. 39-22 at 14 (Lauro Dep. at 51–52). As with the captain-level positions, however, Lauro remained the selecting official. *Id.*

Finally, after the close of discovery and the completion of summary judgment briefing, Panarello was arrested and charged with Driving While Intoxicated ("DWI") on February 14, 2015. Dkt. 44-1 at 1. On March 18, 2016, the Commander of the Park Police's Office of Professional Responsibility proposed terminating Panarello's employment as a result of her DWI arrest. *Id.* Panarello moved to supplement her opposition to the pending motion for summary judgment with the notice of proposed termination, Dkt. 44, and the Court granted that motion by minute order on March 29, 2017. At the same time, however, the Court noted that the proposed termination was not properly before the Court as a separate claim of discrimination or retaliation and that, accordingly, it would consider the proposed action only "to the extent probative" of those claims that were properly before the Court. Minute Order, March 29, 2017.

## B.    Procedural Background

The procedural record is unfortunately confused. Panarello contacted an EEO counselor on January 19, 2010, and informal EEO counseling continued through April 1, 2010. Dkt. 39-2 at 11. According to the EEO counselor, Panarello raised two complaints: First, "she was [allegedly] discriminated against based on retaliation (prior EEO Activity in 2001) when she found out on January 19, 2001, that she was not selected for any of the 4 positions for vacancy announced [in] NPS-USPP-09-08." *Id.* at 6. (That assertion is not quite right. NPS-USPP-09-08 was the announcement for the captain-level positions, Dkt. 39-7 at 2, but only two of the

captain-level positions were filled by that time, Dkt. 39-11 at 2, 4.  The remaining captain-level positions were not filled until February and July 2010.  *Id.* at 5–8; Dkt. 39-12 at 6).  Second, "she was [allegedly] discriminated against based on retaliation (prior EEO Activity in 2001) when she received a [p]roposed [d]emotion."  Dkt. 39-2 at 6.  The EEO counselor was unable to resolve either complaint, *id.* at 11, and Panarello, through counsel, filed a formal administrative complaint with the Park Service's EEO office on April 29, 2010.  Dkt. 39-3 at 2.

The EEO office acknowledged Panarello's formal complaint in a letter dated July 14, 2010.  Dkt. 39-4 at 2.  According to that letter, Panarello's administrative complaint asserted that Panarello "was subjected to disparate treatment on the bases of sex (Female) and reprisal (prior EEO activity) when" (1) "she was not selected for [two] command positions" in April 2010, and "received two separate non-selection notices for the captains position[s] that were advertised under vacancy announcement number NPS-USPP-09-08" in January 2010; (2) "she was denied training to attend the FBI Academy" in September 2009; (3) "she received a 'low' performance evaluation" in January 2010; (4) "she was denied part of an award" and "was not considered as a recipient of the Chief's Certificate for Outstanding Police Service" in May and October 2009; (5) "she was not allowed to sit on the Applicant Review Panel" in August 2009; (6) "she was placed on restricted duty" in October 2009; and (7) "her request was denied to return to midnights, and as a result, she has lost night differential pay" in February 2009.  *Id.* at 2–3.

The EEO officer notified Panarello's counsel that the Park Service was accepting only one claim for investigation.  That assertion, however, requires some clarification because the "one" claim that was accepted for investigation actually combined two separate claims, while omitting portions of one of those claims.  Thus, although the EEO counselor's report and Panarello's administrative complaint both asserted that Panarello was not selected for *four*

captain-level positions in early 2010, the EEO officer limited this claim to "*two* separate non-selection notices for the captain[-level] positions," Dkt. 39-4 at 2 (emphasis added), which were presumably the first two of the four captain-level positions,[2] *see* Dkt. 39-11 at 2–4. Moreover, although the Department asserts in its Statement of Material Facts Not in Dispute that Panarello only exhausted claims with respect to the "four *captain* nonselections," Dkt. 39-1 at 4–5 (emphasis added), and Panarello has not controverted that assertion, the EEO officer actually accepted for investigation Panarello's separate claim that she was not selected for two "command positions" on April 20, 2010—that is, the date on which Panarello was not selected for the *lieutenant*-level "SWAT/K-9" and "Aviation" command positions. Accordingly, although neither party recognizes as much, the record is clear that claim "one," as defined by the EEO officer, included Panarello's contention that the Department violated Title VII when it failed to select Panarello (1) for two of the captain-level positions and (2) for the two lieutenant-level command positions. It was these claims that the EEO officer concluded were timely raised with the EEO counselor.

With respect to all of Panarello's remaining claims, the EEO officer concluded that Panarello did not timely exhaust. As to one of the remaining claims—that Panarello received a "low" performance evaluation—the EEO officer concluded that Panarello never raised the claim with the EEO counselor. *Id.* at 3. And, with respect to the other remaining claims, the EEO officer determined that "[t]he record indicates that" Panarello did not raise these issues with the

---

[2] The Department refers to four separate captain-level positions that Panarello unsuccessfully sought. Panarello was not selected for a fifth position on July 22, 2010, Dkt. 39-12 at 6, approximately one week after the EEO officer accepted Panarello's administrative complaint for investigation. It is beyond dispute, however, that Panarello has not exhausted any challenge she may have with respect to her nonselection for that position.

EEO counselor until "well beyond the 45[-]day timeframe to contact an EO [c]ounselor." *Id.* at 4.

The EEO officer notified Panarello of her right to dispute "the accepted claim as stated" within five days of receipt of the letter. *Id.* at 3. Panarello, however, never submitted "a five-day letter" disputing the scope of her claims accepted for investigation. Dkt. 39-19 at 31 (Panarello Dep. at 117). After the Park Service issued its Report of Investigation on December 20, 2011, Dkt. 1 at 2, Panarello timely exercised her right to request that the Equal Employment Opportunity Commission ("EEOC") appoint an Administrative Law Judge ("ALJ") to adjudicate her case. *Id.* The EEOC, in turn, did not issue a decision within 180 days of Panarello's request, triggering her further right to file suit without continuing to await a decision from the EEOC. *Id.* at 3. She exercised that right and filed the instant suit on December 7, 2012.

Panarello's complaint asserts two causes of action—one for discrimination on the basis of sex in violation of Title VII, 42 U.S.C. § 2000e *et seq.*, and one for retaliation for protected EEO activity in violation of Title VII, *id.* Dkt. 1 at 9 (Comp. ¶¶ 82–85). Although not organized as distinct counts, the complaint identifies seven sets of factual allegations, with the following headings: (1) "The Agency's Disparate Promotion Actions," Dkt. 1 at 3–5 (Compl. ¶¶ 23–39); (2) "Exclusion from Agency Boards/Committees and Denials of Command Assignments," *id.* at 5 (Compl. ¶¶ 40–44); (3) "The Agency's Refus[al] to Train Ms. Panarello," *id.* at 5–6 (Compl. ¶¶ 45–48); (4) "The Agency Issues a Retaliatory Evaluation, Denies Ms. Panarello Awards, and Denies her Further Leadership Opportunities," *id.* at 6 (Compl. ¶¶ 49–54); (5) "The Agency Seeks to Demote Ms. Panarello," *id.* at 6–7 (Compl. ¶¶ 55–67); (6) "Heightened Scrutiny of Ms. Panarello and the Agency's Efforts to Find Information that Would Discredit Her," *id.* at 7–8 (Compl. ¶¶ 68–73); and (7) "The Agency's Refusal to Promote Ms. Panarello," *id.* at 8–9

(Compl. ¶¶ 74–81). Finally, although not framed as a separate count, the complaint includes a single reference to an alleged "hostile work environment" in an introductory paragraph. *Id.* at 2 (Compl. ¶ 12).

## II. LEGAL STANDARD

The moving party is entitled to summary judgment under Federal Rule of Civil Procedure 56 if it can "show that there is no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When, as here, the plaintiff bears the ultimate burden of proof, but the defendant has moved for summary judgment, the defendant "bears the initial responsibility" of "identifying those portions" of the record that "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A fact is "material" if it could affect the substantive outcome of the litigation. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). The Court, moreover, must view the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in that party's favor. *Talavera*, 638 F.3d at 308.

"Although summary judgment is not the occasion for the [C]ourt to weigh credibility or evidence, . . . summary judgment is appropriate if the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* (internal citations and quotation marks omitted). The nonmoving party's opposition, accordingly, must consist of more than unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. *See* Fed. R.

Civ. P. 56(e); *Celotex*, 477 U.S. at 324. That is, once the moving party carries its initial burden on summary judgment, the nonmoving party must provide evidence that would permit a reasonable jury to find in its favor. *See Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987). If the nonmoving party's evidence is "merely colorable" or "not significantly probative," the Court should grant summary judgment. *Liberty Lobby*, 477 U.S. at 249–50.

### III. ANALYSIS

The Department argues that Panarello failed to exhaust most of her claims and that she cannot show discrimination or retaliation as to the claims that she did exhaust. Although the Court's analysis differs from the Department's in certain respects, the Court agrees that the Department is entitled to summary judgment.

### A.    Exhaustion

The EEOC has promulgated detailed regulations establishing procedures for the administrative resolution of employment discrimination claims against federal agencies. A Title VII complainant must timely exhaust these administrative procedures before filing suit in federal court, although the requirements are not jurisdictional and "are subject to equitable tolling, estoppel, and waiver." *Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1997). The relevant procedures are as follows:

> Under Title VII, employees who believe they have been discriminated against must first consult an Equal Employment Opportunity (EEO) Counselor within 45 days of the alleged discriminatory acts. 29 C.F.R. § 1614.105(a)(1). Should the employee and the Counselor fail to resolve the discrimination claim within 30 days, the Counselor sends the employee a notice explaining the administrative complaint procedure. *Id.* § 1614.105(d). The employee then has 15 days to file an individual and/or class complaint with the employing agency. *Id.* § 1614.106 (regulations governing individual complaints); *id.* § 1614.204 (regulations governing class complaints); *see also id.* § 1614.103 (noting types of complaints governed by agency processing procedures outlined in regulations). Upon receipt of a final agency decision . . . disposing of the administrative complaints, the employee has either 30 days to appeal to the Equal Employment Opportunity Commission

(EEOC), *id.* §§ 1614.401(a), 1614.402(a), or 90 days to file suit in federal court, 42 U.S.C. § 2000e−16(c).

*In re James*, 444 F.3d 643, 644 (D.C. Cir. 2006).

"Exhaustion is required in order to give federal agencies an opportunity to handle matters internally whenever possible and to ensure that the federal courts are burdened only when reasonably necessary." *Brown v. Marsh*, 777 F.2d 8, 14 (D.C. Cir. 1985). Failure to exhaust is an affirmative defense, and thus "the defendant bears the burden of pleading and proving it." *Bowden*, 106 F.3d at 437; *see also Brown*, 777 F.2d at 13; *Dick v. Holder*, 80 F. Supp. 3d 103, 111 (D.D.C. 2015); *Koch v. Schapiro*, 699 F. Supp. 2d 3, 12 (D.D.C. 2010). It is only after the defendant meets this burden that the burden shifts to the plaintiff to plead and prove "facts supporting equitable avoidance of the defense." *Bowden*, 106 F.3d at 437; *see also Smith-Haynie v. District of Columbia*, 155 F.3d 575, 578 (D.C. Cir. 1998) ("[A]n affirmative defense may be raised by pre-answer motion under Rule 12(b) when the facts that give rise to the defense are *clear from the face of the complaint.*" (emphasis added)).

For purposes of considering exhaustion, Panarello's claims fall into four categories. She alleges that, based on her sex and in retaliation for her protected EEO activity, she was (1) not selected for the captain-level or command positions; (2) subjected to discipline relating to the Jefferson Memorial incident; (3) denied of training, leadership opportunities, and awards, and given a "low" evaluation; and (4) subjected of a hostile work environment. The Court will consider each in turn.[3]

---

[3] The Department frames this portion of its motion as a motion to dismiss. Because the complaint references Panarello's administrative complaint, Dkt. 1 at 2 (Comp. ¶¶ 14, 15), the Court will treat the administrative record as incorporated by reference for purposes of this motion. *See, e.g.*, *Laughlin v. Holder*, 923 F. Supp. 2d. 204, 209 (D.D.C. 2013) (taking judicial notice of formal administrative complaint that, "though not attached to [plaintiff's] complaint, [is] referred to in the complaint, . . . [is] integral to [plaintiff's] exhaustion of administrative

1.    *Captain-Level and Command Positions*

The first set of claims is easily addressed.  With respect to at least some of the captain-level positions, there is no dispute that Panarello timely raised her nonselection with the EEO counselor and, then, in her administrative complaint.  The Department, thus, concedes that these claims were properly exhausted,[4] Dkt. 39-1 at 5, ¶ 10, and the Court agrees.

The question with respect to the two command positions is more difficult, but only marginally so.  As explained above, it is apparent from the record that the EEO officer accepted those claims for investigation, Dkt. 39-4 at 2, and that the EEO investigation included them along with the claims relating to two of the captain-level positions, Dkt. 39-9 at 2; Dkt. 39-10 at 4.  The record is complicated only by the Department's mistaken assertion in its Statement of Material Facts Not in Dispute that Panarello did not exhaust her claims with respect to the two command positions, Dkt. 39-1 at 5, and by Panarello's failure to file "a separate concise statement of genuine issues" contesting the Department's assertion, as required by Local Civil Rule 7(h)(1).  Under these circumstances, the Court might "consider the fact[s]," as stated by the Department," as "undisputed for purposes of the motion."  Fed. R. Civ. P. 56(e)(2).  But, as the D.C. Circuit has cautioned, treating a dispositive fact as conceded is not usually the "preferred first step."  *Grimes v. District of Columbia*, 794 F.3d 83, 92 (D.C. Cir. 2015) (quoting Advisory

---

remedies, and [is a] public record[] subject to judicial notice" (internal citation omitted)); *see also Clark v. Johnson*, 206 F. Supp. 3d 645, 648 n.1 (D.D.C. 2016).  Alternatively, to the extent necessary, the Court will treat the Department's motion to dismiss as a motion for summary judgment pursuant to Rule 12(d).  *See, e.g.*, *Lane v. Tschetter*, 05-cv-1414, 2007 WL 2007494, at *2 n.4 (D.D.C. July 10, 2007).

[4]  Although it appears that Panarello did not exhaust her administrative remedies as to two of the four of the captain-level positions, neither side had addressed the issue, and, for the reasons explained below, resolution of that question is unnecessary to the Court's ultimate disposition. *See infra* n. 8.

Committee notes); *see also King v. Dep't of Justice*, --- F.3d ---, 2017 WL 1166309, at \*2 (D.D.C. March 28, 2017). That admonition is well taken here for three reasons: First, it appears that the defendant simply made a mistake, which the plaintiff failed to catch or correct. Second, the relevant assertion of "fact"—that Panarella failed to exhaust administrative remedies with respect to the command positions—arguably embeds an issue of law, which the Court is not permitted to take as conceded. *See Winston & Strawn, LLP v. McLean*, 843 F.3d 503, 507 (D.C. Cir. 2016). Third, in any event, the defendant offers an alternative ground for rejecting the relevant claim, thus obviating the need for the Court to depart from the "preferred" course. The Court will, accordingly, deny the Department's motion to dismiss Panarello's claim relating to the two command positions for failure to exhaust.

### 2. *Jefferson Memorial Discipline*

Panarello's second claim—that she was subjected to discipline for the Jefferson Memorial incident in violation of Title VII—presents a more difficult question due to ambiguity in Panarello's administrative complaint. The Park Service's EEO office declined to investigate that claim on the ground that Panarello "was placed on restricted duty" on October 14, 2009—more than 45 days before Panarello initiated the EEO counseling process. Dkt. 39-4 at 4. That conclusion, however, tells only a portion of the story. Panarello was placed on restricted duty on the same day that Deputy Chief O'Toole proposed that Panarello receive a reduction in rank to sergeant. Dkt. 39-23 at 14. Ultimately, that proposal was not accepted and, instead, on January 22, 2010, Assistant Chief Lynch decided to impose the lesser discipline of a two-week suspension. *Id.* at 9. It appears that Panarello, then, raised her suspension in the EEO counseling process, which was still ongoing on January 22, 2010. The EEO counselor, for example, calculated the 45-day window for seeking counseling from the date of Lynch's decision, Dkt. 39-

2 at 6, and the EEO counselor interviewed Lynch about his decision to impose the two-week suspension, *id.* at 9. But, when Panarello filed her administrative complaint, she was unclear about precisely what she was challenging. The Court will quote the relevant allegation in full:

> Lt. Panarello also has been *subject to adverse action proceedings disproportionate to the seriousness of the allegations and inconsistent with discipline given other coworkers for more serious conduct*. Moreover, the Agency has handled this disciplinary proceeding in bad faith, as shown, for example, by its violation of its own "Agreement to Mediate" in the course of Lt. Panarello's grievance of the discipline. This grievance is pending.
>
> On October 14, 2009, *Lt. Panarello was placed on restricted duty with her police powers suspended* for an incident that occurred on April 11, 2008. Prior to this action, Lt. Panarello was field training Lieutenants, handling critical incidents, completing mandatory training, fulfilling the duties entrusted to her. Meanwhile, most if not all complaints generated by . . . personnel against Sgt. M. Johnson (Panarello's accuser in the disciplinary action) including racial profiling and inappropriate sexual comments against a female coworker had not been the basis for discipline.

Dkt. 39-3 at 7-8 (emphasis added). The administrative complaint goes on to identify other Park Police officers who were not disciplined but who, in Panarello's view, had committed equally serious infractions. *Id.* at 8. It includes no reference, however, to January 22, 2010, or to the two-week suspension that was imposed on that date.

The Park Service's "acceptance-of-claim" letter identified the relevant "claim[] for investigation and further processing" as the allegation that Panarello was subjected to "disparate treatment on the bases of sex . . . and reprisal . . . when on October 14, 2009, she was placed on restricted duty." *Id.* at 3. And, based on this characterization, the EEO officer concluded that the claim was premised on an incident—Panarello's placement on restricted duty—that occurred outside the 45-day window for initiating the counseling process. *Id.* at 4. Finally, the "acceptance-of-claim" letter advised Panarello's counsel that, if Panarello was "not satisfied with

the accepted claim as stated," she could "within 5 calendar days of receipt of this letter, submit a statement to this Office concerning our articulation of the issue, which will become a part of the complaint file." Dkt. 39-4 at 3. Panarello did not respond or otherwise seek to clarify the scope of her claim. *See* Dkt. 39-19 at 31 (Panarello Dep. at 117).

It thus appears that the EEO counselor was aware of the January 22, 2010, discipline and, indeed, interviewed Lynch about his decision. But it is far less clear that Panarello raised the January 22, 2010, suspension—as opposed her placement on restricted duty on October 14, 2009—in her administrative complaint. And it is evident that the EEO officer construed the administrative complaint as challenging only the October 14, 2009, decision placing Panarello on restricted duty and that Panarello's counsel did nothing to correct that impression when given the opportunity to do so. The question, then, is whether Panarello acted with sufficient clarity and diligence in pursuing a challenge to the Park Service's Janaury 22, 2010, decision suspending her for two weeks. As explained below, the Court concludes that she did not.

Judges in this district have taken different approaches in deciding whether a failure to dispute an agency's framing of the issues for investigation bars a plaintiff from revisiting the issue in litigation. "[T]here are cases from this district holding that a plaintiff's 'failure to respond to the [agency's] framing of the issue supports a finding that a plaintiff has failed to exhaust his administrative remedies with respect to those claims not approved by the EEO.'" *Mokhtar v. Kerry*, 83 F. Supp.3d 49, 65 (D.D.C. 2015) (quoting *McKeithan v. Boarman*, 803 F. Supp. 3d 63, 68 (D.D.C. 2011) (internal citations and quotation omitted), *aff'd in part*, No. 11-5247, 2012 WL 1450565 (D.C Cir. 2012), *aff'd sub. nom., McKeithan v. Vance-Cooks*, 498 F. App'x 47 (D.C. Cir. Apr. 12, 2012)). The theory underlying these decisions is that an employee who fails to "augment the 'accepted allegation[,]' . . . despite the [agency's] express invitation to

do so," has not "'diligently pursued'" those claims that were not accepted for investigation, *see Green v. Small*, Civ. No. 05-1055, 2006 WL 148749, at * 6 (D.D.C. Jan. 19, 2006), or, put somewhat differently, has failed to "cooperate throughout the administrative investigation," *Mokhtar*, 83 F. Supp. 3d at 66. In other cases, however, the Court has declined to apply "such a hardline approach" and, instead, has treated the "failure to cooperate during the administrative investigation" as "distinct from [the] failure to respond to the acceptance-of-claims letter." *Id.*

The Court recognizes that "an acceptance-of-claims letter, though organizationally useful in clarifying the topics to be investigated, is not a mandated pre-investigation procedure under any statute or regulation." *Id.* Accordingly, an employee who fails to clarify the topics identified in an "acceptance-of-claim" letter does not *invariably* forfeit an omitted claim. But employees do have an obligation to cooperate in the administrative process. That obligation encompasses a duty to provide reasonable specificity in the charges asserted and, in the face of uncertainty, to clarify the scope of the relevant allegations. As the D.C. Circuit has stressed, the exhaustion doctrine is a "'pragmatic'" one, designed to avoid unnecessary "roadblocks," while giving "federal agencies an opportunity to handle matters internally whenever possible and to ensure that the federal courts are burdened only when reasonably necessary." *Brown*, 777 F.2d at 14. It is not intended to erect barriers for "individuals untrained in negotiating procedural labyrinths," *Loe v. Heckler*, 768 F.2d 409, 417 (D.C. Cir. 1985), but, by the same token, it does not permit an employee to pursue claims that are so vague that the agency cannot reasonably perform its "investigatory and conciliatory role," *Marshall v. Fed. Express Corp.*, 130 F.3d 1095, 1098 (D.C. Cir. 1997). The requirement of "'some specificity'" is not a "'"mere technicality,"'" *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995) (citation omitted); it ensures that the administrative process is meaningful.

In light of these considerations, the Court concludes that Panarello has not preserved the right to challenge Lynch's January 22, 2010, disciplinary action imposing a two-week suspension. A number of factors inform the Court's decision. First, Panarello was represented by counsel in the administrative process, and, therefore, this is not a matter in which an "untrained" individual was caught in a "procedural labyrinth." *Loe*, 768 F.2d at 417. Second, the EEO officer's interpretation of Panarello's administrative complaint was not only a reasonable, but the most reasonable, interpretation of the document. Although the administrative complaint does refer generically to "adverse action proceedings" and to "[d]isparate [d]iscipline," it adds meat to these bones, asserting that "Panarello was placed on restricted duty" on October 14, 2009. Dkt. 39-3 at 7. It contains no similar reference, however, to the January 22, 2010, suspension. *Id.* It is thus not surprising that the EEO officer construed Panarello's claim as a challenge to the agency's "October 14, 2009" action placing Panarello "on restricted duty." Dkt. 39-4 at 3. Third, to the extent the EEO officer misconstrued the administrative complaint, Panarello's counsel was notified in plain terms that she could, "within **5 calendar days**," clarify the record. *Id.* (emphasis in original). She failed to do so. As a result, those charged with investigating Panarello's claims were never provided reasonable notice that Panarello sought to challenge both her placement on "restricted duty" and her subsequent suspension.

Because Panarello failed to initiate EEO counselling within 45 days regarding her placement on restricted duty, and because she failed to provide the EEO officer with reasonable notice that she also sought to challenge her suspension, the Court must conclude that Panarello failed to timely exhaust her claims relating to the Jefferson Memorial incident.

3. *Training, Leadership Opportunities, Awards and "Low" Evaluation*

Panarello's third set of claims—that she was denied training, leadership opportunities and awards and was given an unduly "low" evaluation—does not require extended discussion. As the EEO officer concluded, Panarello's claims for denial of training, leadership opportunities, and awards arose between May and October 2009—all well before the 45-day window preceding Panarello's initiation of the EEO counseling process on January 19, 2010. Dkt. 39-4 at 2-4. And, as the EEO officer further concluded, Panarello did not raise her claim regarding her "low" evaluation in the counseling process. Dkt. 39-4 at 3. Panarello does not dispute any of this, and, accordingly, the Court concludes that each of these claims must be dismissed for failure to timely exhaust. *See Payne v. Salazar*, 619 F.3d 56, 65 (D.C. Cir. 2010).

4. *Hostile Work Environment*

Finally, Panarello claims that she was subjected to a hostile work environment. The exhaustion rules applicable to a hostile work environment claim differ from those applicable to discrete claims of discrimination or retaliation in one critical respect: an EEO complaint is timely if at least "one of the alleged acts comprising the hostile work environment" falls within the time period specified for initiating counseling and filing an administrative complaint, and the remaining "acts are part of the same unlawful employment practice." *Bergbauer v. Mabus*, 934 F. Supp. 2d 55, 82 (D.D.C. 2013). Panarello contends that this is such a case, Dkt. 41 at 10–11, and the Department disagrees, Dkt. 43 at 16–17. As explained below, the Court concludes that the Department has the better view.

In *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), the Supreme Court recognized that different rules apply in assessing the timeliness of claims challenging "discrete discriminatory and retaliatory acts" and claims challenging a hostile work environment.

With respect to the first category, "discrete discriminatory [or retaliatory] acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Id*. at 113. Instead, "[e]ach incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice,'" and each "starts a new clock for filing charges alleging that act." *Id.* at 113–14. "Hostile environment claims," in contrast, "are different in kind from discrete acts" because "[t]heir very nature involves repeated conduct." *Id*. at 115. As a result, "[p]rovided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id.* at 117. Although *Morgan* dealt with the requirement that an employee bring an EEOC charge within 180 or 300 days of the alleged unlawful employment action, the same principles apply to the exhaustion of other administrative remedies. *See Achagzai v. Broad. Bd. of Governors*, 170 F. Supp.3d 164, 175–76 (D.D.C. 2016).

It bears emphasis that *Morgan* did not create "an open sesame to recovery for time-barred violations." *Baird v. Gotbaum*, 662 F.3d 1246, 1250 (D.C. Cir. 2011). Rather, incidents that were not timely raised in the administrative process are preserved only if they were "part of the same actionable hostile environment claim" as other incidents that were timely raised. *Morgan*, 536 U.S. at 121; *see also Vickers v. Powell*, 493 F.3d 186, 198–99 (D.C. Cir. 2007) (applying rule to 45-day window for initiating counseling). The question whether such incidents "are adequately linked into a coherent hostile environment claim," moreover, is not easily answered. *Baird*, 662 F.3d at 1251. We know, for example, that it is *sufficient* that the "incidents involve[d] the same type of employment actions, occurred relatively frequently, and were perpetrated by the same managers," *Morgan*, 536 U.S. at 120, but "neither the Supreme Court

*nor any circuit*" has yet to offer a definitive test for what is *necessary* to establish that the incidents are "'sufficiently related'" to form a "coherent" claim, *Baird*, 662 F.3d at 1251.

On the present record, the Court is reluctant to hold—as a matter of law—that the incidents Panarello cites fail this test. To be sure, the incidents occurred over a course of two years and involved different decisionmakers. Dkt. 39-4 at 2–3. But, the incidents share the common themes that Panarello was allegedly denied opportunities to advance her career— through training, leadership opportunities, awards, and promotions—and that all of these acts were taken in retaliation for Panarello's protected EEO activity. On seemingly more disparate facts, the D.C. Circuit held in *Vickers v. Powell*, 493 F.3d 186, 200 (D.C. Cir. 2007), that the district court erred by granting summary judgment to the defendant on the ground that the actions of a manager and his successor—one set involving offensive sexual references and the other involving offensive sexist, racial and other comments—"could not reasonably be considered part of the same hostile work environment." *Id.* at 200. Accordingly, the problem here is not one of insufficient relatedness.

Panarello faces a further hurdle, however, and this one is dispositive. Citing *Park v. Howard University*, 71 F.3d 904 (D.C. Cir. 1995), the Department argues that Panarello did not assert a hostile work environment claim in the administrative process and that, accordingly, she cannot now do so. Dkt. 43 at 16. In *Park*, the plaintiff filed an administrative claim with the EEOC, alleging that Howard University discriminated against her based on her sex and national origin when it chose "a white American" instead of her to fill a position as an assistant dean. In litigation, however, she added a claim that alleged "'[a]n on-going pattern of discrimination against [the] plaintiff based on her sex and national origin which created a hostile work environment.'" 71 F.3d at 906. On appeal, the D.C. Circuit concluded that the plaintiff failed to

exhaust a hostile work environment claim and that, accordingly, the district court should never have reached the merits of the claim. As the Court of Appeals explained, "Park's [EEOC] charge not only lack[ed] the words 'hostile work environment,' but also lack[ed] any factual allegations supporting such a claim," and "[t]he bald statement that 'it is my belief that I was denied the opportunity for advancement in my career because of . . . my national origin' [could] not be read to encompass a hostile work environment claim." *Id.* at 908.

Although this case presents a closer question than *Park*, the result is the same. As in *Park*, Panarallo's administrative complaint contains no mention of a hostile work environment but, rather, identifies a series of discrete acts of alleged discrimination or retaliation. Moreover, the acceptance-of-claim letter treated each incident as a distinct claim, and, when given the opportunity, Panarello did not dispute that characterization of her claims.

Had Panarello's administrative complaint contained factual allegations sufficient to put the Department on notice that she, in effect, asserted a hostile work environment claim, *see Park*, 71 F.3d at 908, her failure to use that specific label would not be dispositive, *see Wade v. District of Columbia*, 780 F. Supp. 2d 1, 12 (D.D.C. 2011). But it did not, and "[c]ourts have been reluctant to transform" claims that amount to little more than "an amalgamation of disparate treatment claims" into a hostile work environment claim. *Wade*, 780 F. Supp. 2d at 19. Were the Court to accept Panarello's argument, aggrieved employees could assert a series of timely and untimely disparate treatment or retaliation claims in the administrative process; the agency would then, in the ordinary course, decline to investigate the untimely claims; and the employee could nonetheless later seek to litigate the untimely claims under the rubric of a hostile work environment claim, even though the agency was never on notice of the need to investigate and, if appropriate, resolve those claims. The principle that prevents this circumvention is the

requirement that, regardless of whether an administrative complaint invokes the "hostile work environment" label, it must put the agency on reasonable notice that the employee's charge encompasses a hostile work environment claim.  Panarello's administrative complaint fails this test.

An allegedly hostile workplace is actionable only "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and [to] create an abusive working environment.'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986)).  This, in turn, requires both a subjective and an objective inquiry—the challenged conduct must be "severe or pervasive enough to create an objectively hostile or abusive environment," and the victim must "subjectively perceive the environment to be abusive." *Id.*  "[W]hether an environment is 'hostile' or 'abusive'" turns on "all the circumstances" and does not admit of "a mathematically precise test." *Id.* at 22–23.  Relevant factors, however, "may include the frequency of the discriminatory [or retaliatory] conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23.

Here, even a liberal construction of Panarello's administrative complaint would not have put the Department on reasonable notice that she sought to raise a hostile work environment claim.  The complaint raises a series of discrete acts allegedly taken for discriminatory or retaliatory reasons.  Although a series of "incidents of disparate treatment can establish a hostile work environment *if connected in [a] pervasive pattern of severe harassment*," *Wade*, 780 F. Supp. 2d at 19 (emphasis added), "'a plaintiff may not combine discrete acts to form a hostile work environment claim without meeting the required hostile environment standard,'" *Brooks v.*

*Grundman*, 748 F.3d 1273, 1278 (D.C. Cir. 2014). Moreover, courts "have generally rejected hostile work environment claims that are based on work-related actions by supervisors." *Wade*, 780 F. Supp. 2d at 19 (collecting cases). Here, however, Panarello's administrative complaint offers nothing more than a series of asserted incidents of disparate treatment taken by her supervisors in the ordinary course of their duties. It alleges, for example, that Panarello was denied various promotions and assignments; that she was denied an opportunity to train at the FBI academy; that she did not receive two awards; and that she was placed on restricted duty following the Jefferson Memorial incident. Dkt. 39-3 at 3-8. Significantly, it contains no allegation that she was subjected to "intimidation, ridicule, or insult," that she was "physically threatened or humiliated," or that she was subject to any form of abuse other than the denial of opportunities to which she contends she was entitled.

Because "[d]iscrete acts constituting discrimination or retaliation claims . . . are different in kind from a hostile work environment claim," which "must be based on severe and pervasive discriminatory intimidation or insult," Panarello's administrative charges of disparate treatement cannot reasonably be transformed into a hostile work environment claim. *Lester v. Natsios*, 290 F. Supp. 2d 11, 33 (D.D.C. 2003), *aff'd*, 2004 WL 287128 (D.C. Cir. Feb. 4, 2004). The Court, accordingly, concludes that Panarello failed to exhaust her hostile work environment claim.[5]

**B.     Nonselection Claims**

This, then, leaves Panarello's claims that the Park Police failed to promote her to a captain-level position or to select her for the SWAT/K-9 and Aviation command positions based

---

[5] Moreover, because Panarello's complaint in this Court contains no additional allegations that would meet the standard for alleging a hostile work environment claim, the Court, in the alternative, holds that the complaint fails to state a hostile work environment claim upon which relief may be granted.

on her sex and protected EEO activity. As explained below, the Court concludes that the

Department has proffered legitimate, nondiscriminatory and nonretaliatory reasons for its actions

and that Panarello has failed to identify any evidence that would permit a reasonable jury to find

that the Department's stated rationales are pretextual and that the Department, in fact,

intentionally discriminated or retaliated against her. The Court will, accordingly, grant summary

judgment in favor of the Department on these claims.

Title VII of the Civil Rights Act prohibits the federal government from discriminating in

employment on the basis of sex, *see* 42 U.S.C. § 2000e-16, and from retaliating against

employees for engaging in activity protected by Title VII, *see* 42 U.S.C. § 2000e-3(a); *Ethnic*

*Emps. of Library of Cong. v. Boorstin*, 751 F.2d 1405, 1415 n. 13 (D.C. Cir. 1985). In a case in

which the plaintiff lacks direct evidence of discrimination or retaliation, the burden shifting

framework laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies, under

which the plaintiff must first make out a prima facie case of discrimination or retaliation, and the

burden then shifts to the employer to offer a legitimate nondiscriminatory reason for its action.

*See, e.g.*, *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1113–14 (D.C. Cir. 2016) (race

discrimination); *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009) (retaliation).

Once an employer has proffered a legitimate nondiscriminatory reason for its action,

however, "the district court need not—*and should not*—decide whether the plaintiff actually

made out a prima facie case under *McDonnell Douglas*." *Brady v. Office of Sergeant at Arms*,

520 F.3d 490, 494 (D.C. Cir. 2008) (emphasis in original). At that point, the only question for

the Court is "whether the plaintiff produced sufficient evidence for a reasonable jury to find that

the employer's asserted non-discriminatory reason was not the actual reason and that the

employer intentionally discriminated against the plaintiff on a prohibited basis." *Adeyemi v.*

*District of Columbia*, 525 F.3d 1222, 1226 (D.C. Cir. 2008). That same rule also applies in Title VII retaliation cases; once the employer comes forward with a legitimate, nonretaliatory justification for its action, the focus of the litigation shifts to whether there is sufficient evidence for a reasonable jury to find that the asserted rationale is pretextual and that the real reason for the employer's action was to retaliate against the employee for engaging in protected activity. *See Jones*, 557 F.3d at 678 (applying *Brady* to retaliation claim).

A plaintiff can establish a discriminatory employment practice under Title VII in one of two ways. Under the "'single-motive' or 'pretext' theory of discrimination," the plaintiff must show that a protected characteristic was a but-for cause of the adverse employment action. *See Fogg v. Gonzales*, 492 F.3d 447, 451 (D.C. Cir. 2007). Under the "motivating factor" standard, also known as the "mixed-motive" standard, a plaintiff can prevail by showing that a protected characteristic was a motivating factor in the adverse employment action. *See Ponce v. Billington*, 679 F.3d 840, 844 (D.C. Cir. 2012). The more forgiving "motivating factor" standard, however, is not available for retaliation claims; a plaintiff alleging retaliation can prevail only by showing but-for causation. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013).

1.  *Captain-Level Positions*

According to the Department, Panarello's nonselection for the captain-level positions was based on one—and only one—consideration: she was less well qualified than the applicants who were selected. The selecting official, Chief Lauro, attested in the course of the administrative EEO investigation that the selection process was driven by "a promotion roster that was broken down into two categories—qualified and well qualified." Dkt. 39-9 at 4. The recommending officials would select three candidates from the roster, and Lauro would then select from among

the three recommended candidates. *Id.* Ordinarily, the three recommended candidates were selected "from the well qualified list," *id.*, but "if nobody from the well-qualified list" applied, Lauro would consider candidates from the "qualified list," Dkt. 41-6 at 11 (Lauro Dep. at 36–37). Where candidates from the "well-qualified" list applied, however, those on the "qualified list" were not considered. As Lauro put it at his deposition: "Otherwise[,] why have the list?" *Id.* (Lauro Dep. at 37).

Lauro further attested that "Panarello did not make the well qualified list"—and, in fact, "was rated near the bottom of the [overall] list (24 out of 25 candidates) by the assessors"—and, that, as a result, she "was not considered for the positions." Dkt. 39-9 at 4. That decision was "not based on anyone's sex or protected [EEO] activities," according to Lauro, but, rather, was "totally on merit." *Id.* at 5. Lauro added that he was unaware of Panarello's EEO activity at the time he made his decision with respect to the first two captain-level positions, *id.* at 4, and that he only became aware of it when Panarello herself raised the issue in her "written grievance"— submitted after those selections—challenging her two-week suspension. Dkt. 39-23 at 15.

Because the Department has offered a legitimate, nondiscriminatory reason for its decision not to promote Panarello to captain, Panarello bears the burden of "produc[ing] sufficient evidence for a reasonable jury to find that the [Department's] asserted non-discriminatory reason was not the actual reason and that [it] intentionally discriminated [or retaliated] against [Panarello] on a prohibited basis." *Adeyemi*, 525 F.3d at 1226. She has failed to carry this burden.

Panarello does not dispute that Lauro was unaware of her participation in any EEO activity at the time he made the first two selections for captain-level positions—that is, the only two captain-level positions for which Panarello appears to have exhausted her administrative

remedies, *see supra* n. 4; *infra* n. 8.   Nor does she point to any evidence that Lauro acted with discriminatory or retaliatory animus or that the candidate assessment process was itself motivated by discriminatory or retaliatory animus.   And, although she does note that the "evaluation committee [for the KSAs] [was] selected by higher-up supervisors" and that "the evaluators know who the candidates are," Dkt. 41 at 14, she offers no evidence that her sex or prior EEO activity played any role in the selection of the committee members or that any of the committee members acted with a discriminatory or retaliatory purpose.[6]

Panarello's retaliation claim is made particularly difficult by the fact that the central figure in her theory of the case, David Stover, retired from the Department in September 2008— over a year before the selection roster was published, Dkt. 39-8 at 2 (Oct. 16, 2009), and fifteen months before any of the captain-level vacancies were filed, Dkt. 39-11 at 2, 4 (first two positions filled on Dec. 5, 2009).   In an effort to overcome this obstacle, Panarello contends that Jeanne O'Toole, who served as deputy chief in 2009 and 2010, shared Stover's retaliatory animus.   Her support for that allegation, however, is too thin to avoid summary judgment.   *See, e.g.*, *Laningham*, 813 F.2d at 1241.

Panarello identifies only three facts, which she contends show that O'Toole shared Stover's purported retaliatory animus.   Panarello first asserts that she was told by her supervisor, Captain Phillip Beck, "that Stover and O'Toole refused to allow her to receive a level '4' rating (the highest available rating)" on her 2005 evaluation.   Dkt. 41-1 at 1, ¶ 4.   Rather than offer testimony from Beck, Panarello relies on her own deposition testimony.   In the course of the depositon, Panarello asserted that "Beck wanted to give [her] level fours, but he wasn't allowed

---

[6]  The KSA only accounted for half of the evaluation score, and the second half of the score came from an "external" evaluation conducted by assessors unaffiliated with the Park Police. Dkt. 39-5 at 5; Dkt. 39-18 at 3 (Lauro Decl. ¶ 8).

to." Dkt. 39-19 at 13 (Panarello Dep. 47). When asked "who *would have* told [Beck] not to," Panarello responded "[y]ou had Deputy Chief Stover and Deputy Chief O'Toole." *Id.* (emphasis added). Later in the deposition, Panarello was asked: "So, now, you just mentioned that Stover told Beck not to give you higher than a 3, Stover and O'Toole," and she responded "[y]es, ma'am." *Id.* at 14 (Panarello Dep. at 49). Even reading this testimony in the light most favorable to Panarello, the first answer does not say that Stover and O'Toole both told Beck not to give Panarello the highest rating; it merely asserts that they "would have" been the ones to provide such a direction. And the second question simply summarizes Panarello's prior testimony as a prelude to asking "[w]hat influence . . . Stover had over Beck." *Id.* Panarello's speculation about who "would have" told Beck not to give Panarello a rating above a three is insufficient to permit a reasonable jury to infer that *both* O'Toole *and* Stover were involved in this episode, that Stover was motivated by the 1998 litigation (which settled five years earlier), and, most significantly, that whatever involvement O'Toole had, if any, shows that she shared Stover's retaliatory motivation.

Panarello seeks to bolster her argument by noting that "Stover made O'Toole Acting Commander before he retired." Dkt. 41-1 at 6, ¶ 49. But that occurred years *after* Beck was told not to give Panarello the highest rating and thus cannot explain that incident. Nor is the mere conferral of a temporary promotion sufficient, absent more, to permit a reasonable jury to find that O'Toole acted as Stover's agent-of-retribution when she failed to recommend Panarello—who was ranked twenty-fourth of twenty-five on the promotion roster—for promotion to a captain-level position.

Finally, Panarello observes that O'Toole was the recommending official for the Jefferson Memorial disciplinary proceeding; that she recommended that Panarello receive a demotion; and

that she "had not issued a proposed demotion to any other employee." *Id.* at 2, ¶ 9. For the reasons just explained, however, there is no evidence that would permit a reasonable jury to find that O'Toole held any retaliatory (or sex-based) animus against Panarello, nor was the discipline that O'Toole recommended so harsh or outside the norm that a reasonable jury could infer that her recommendation was motivated by something beyond the Jefferson Memorial incident itself. Although Panarello questions the seriousness of her misconduct, she does not dispute that the alleged events occurred; that she was the senior officer and supervisor at the scene; and that she acted in a "sophomoric" manner. Dkt. 41 at 18. In addition, although Lynch ultimately imposed a lesser sanction, he made clear that he agreed with O'Toole's assessment of the relevant disciplinary factors and that his decision was based, in substantial part, on the long delay between the incident and his decision. Dkt. 39-23 at 11–12.

Overall, the logic of Panarello's argument is apparently as follows: Stover was implicated in Panarello's EEO activity between 1993 and 2000; he held a grudge about this many years later; Beck was told not to give Panarello the highest evaluation in 2005, and such an instruction "would have" come from Stover and O'Toole; it is reasonable to infer that Stover "would have" taken this action in retaliation against Panarello, and one can infer that O'Toole "would have" acted with the same motivation as Stover; years later, at the time he retired, Stover made O'Toole Acting Commander, and she must have been indebted to him for that career advancement; around that same time, O'Toole recommended that Panarello receive a demotion for her concededly "sophomoric" actions in the Jefferson Memorial incident, further evidencing O'Toole's desire to retaliate against Panarello for her protected EEO activity almost a decade earlier; and this animus was the but-for cause of Panarello's nonselection for a captain-level position, despite the facts that Panarello was not on the "well qualified" list, that Lauro offered

unrebutted testimony that he was not prepared to consider any applicants who did not make that list, that none of the four other officials involved in the discussing the promotion ever mentioned or suggested that Panarello receive consideration, and that O'Toole did not make any negative comments (or, indeed, any comments) about Panarello in the discussions. Even when considered as a whole, this evidence is too thin a soup to permit a reasonable jury to find that O'Toole acted with retaliatory animus, much less that her animus was the *but-for* cause of Panarello's nonselection.

Panarello also points to a number of other actions taken by the Park Police "management," which she contends were a product of sex discrimination or retaliation. It is unclear from her brief whether she seeks to pursue these incidents as separate claims (which she failed to exhaust), as part of a hostile work environment claims (which she also failed to exhaust), or as evidentiary support for her claim that her nonselection for a captain-level position was the product of sex-based or retaliatory animus. Dkt. 41 at 18–23. But, even assuming the last of these possibilities, she has failed to offer sufficient evidence of sex discrimination or retaliatory intent or a nexus to the nonselections. To begin, Panarello makes no argument that any of these actions were motivated by sex discrimination; instead, she argues that they "[s]how [r]etaliatory [i]ntent." *Id.* at 12. Her only plausible claim of retaliatory intent rests on the premise that Stover continued to harbor a grudge against Panarello for her involvement in the 1998 litigation. There is no evidence, however, that Stover, who retired in September 2008, played any role in her nonselection in December 2009 or that the actions that he did take before retiring played any role in her nonselection.

Finally, the fact that the Park Police proposed to terminate Panarello for her DWI arrest in 2015 does not advance her case. Once again, Panarello points to no evidence that sex

discrimination motivated the Park Police's action. And, similarly, she fails to offer any evidence that the proposed termination was part of a pattern of retaliation against her. By the time of the proposed termination, every one of the officers Panarello identifies as having been involved in any of the events she complains of—including the Jefferson Memorial discipline, her nonselection for a captain-level or command position, and the decisions not to send her to the FBI Academy or to allow her to serve on boards—had retired from the Park Police. Stover retired from the Park Police in September 2008, Dkt. 39-20 at 5 (Stover Dep. at 12); Lauro left in January 2011, Dkt. 39-22 at 3 (Lauro Dep. at 9); Lynch departed in June 2011, Dkt. 41-5 at 5 (Lynch Dep. at 10); and O'Toole left in November 2013, Dkt. 39-21 at 3 (O'Toole Dep. at 6). Panarello's DWI incident did not take place until February 14, 2015, nearly eighteen months after O'Toole retired and more than six years after Stover left the force. Dkt. 44-1 at 1. And the proposed termination was not issued until more than a year after that, on March 18, 2016. *Id.* There is, accordingly, no basis in the record from which a reasonable jury could find that the proposed termination was part of a pattern of retaliation that would not have occurred but for Panarello's EEO activity between 1993 and 2000.

The Department, accordingly, is entitled to summary judgment on Panarello's claim that she was denied promotion to captain based on her sex or protected EEO activity.

2. *Command Positions*

Finally, Panarello contends that she was not selected for two command positions—as a SWAT/K-9 commander and as an Aviation commander—based on her sex and protected EEO activity. Chief Lauro was again the selecting official, and he again attested in the administrative process that his decision was based solely on merit. Dkt. 39-9 at 3. Much of the same analysis set forth above applies to this claim, with two exceptions: First, Lauro was aware of Panarello's

EEO activity by the time he made the selections for these two positions. Second, Lynch had actually imposed the two-week suspension on Panarello for the Jefferson Memorial incident by this time, Dkt. 39-23 at 9, and Lauro conceded that this discipline, although not determinative, "was considered," Dkt. 39-9 at 3. As explained below, however, neither of these distinctions supports a different result.

First, the fact that Lauro was aware of Panarello's prior EEO activity does not provide a sufficient basis for reasonable jury to find that his stated rationale—that the "skill sets" of the selected candidates "far exceeded" Panarello's, *id.*—was pretextual. Panarello offers no evidence that Lauro, the two recommending officials for the command positions—Captain Charles Guddemi or Major Rob McLean, Dkt. 39-9 at 2—or Lauro's management team— O'Toole, Lynch, and Ken Brodie—were motivated by Panarello's decade-old EEO activity. There is no evidence that Stover, who retired nineteen months earlier, played any direct or indirect role in Panarello's nonselection, and, for the same reasons explained above, there is no evidence that would permit a reasonable jury to find that O'Toole acted as Stover's "cat's paw" in the selection process, *see Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011), or, more generally, that Stover had turned O'Toole against Panarello.

Second, the fact that Lynch imposed a two-week suspension on Panarello for the Jefferson Memorial incident does not create a triable issue of fact. As an initial matter, the uncontested record evidence shows that her suspension, if anything, played only a secondary role in Lauro's decision. He attested, without contradiction, that the discipline was not "the primary reason that" Panarello "was not selected" and that the two other candidates were selected because "their skill sets far exceeded hers." Dkt. 39-9 at 3. Panarello does not challenge this characterization of his decision. And, because a retaliation claim requires a showing of but-for

causation, *Nassar*, 133 S. Ct. at 2534, the Court is unconvinced that a reasonable jury could find in favor of Panarello based on this evidence.

But, even if the discipline had played a dispositive role in Lauro's decision, Panarello has failed to identify evidence from which a reasonable jury could find that the two-week suspension was imposed in retaliation for Panarello's participation in the 1998 litigation and the preceding EEO investigation. To the extent Panarello maintains that the Jefferson Memorial discipline was the indirect cause of her nonselection, she must, at a minimum, identify evidence that would permit a reasonable jury to find that the stated reasons for the discipline—that her actions "projected a serious lack of judgment and" failed to meet the "expectation[s] [of] a person in the position of a Force Lieutenant," Dkt. 39-23 at 10—were pretextual. *See, e.g.*, *Brady*, 520 F.3d at 494 ("[I]n considering an employer's motion for summary judgment . . . the district court must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason . . .?"). She has not done so. As explained above, there is insufficient evidence to permit a reasonable jury to find that O'Toole acted with sex-based or retaliatory animus when she recommended disciplinary action against Panarello, and Panarello does not even suggest that Lynch (who imposed the actual discipline) acted for anything other than the stated reasons.[7]

---

[7] The Court's own review of the record reveals one statement suggesting that Stover was at least aware of the investigation of Panarello's conduct. Panarello testified in her deposition that David McSherry, one of the other officers involved in the incident, told her that he approached Stover at a conference and brought up the Jefferson Memorial incident. Dkt. 39-19 at 49 (Panarello Dep. at 191–92). According to Panarello's retelling, McSherry apologized for the role he played in the incident, admitted that he was the one "clowning around with the dildo," and said that Panarello "did nothing wrong, except try and take the picture." *Id.* (Panarello Dep. at 192). To this, Stover purportedly responded, "You are not the target." *Id.* Panarello makes no mention of this testimony in her opposition brief or "Statement of Facts in Opposition to Summary Judgment," Dkt. 41; Dkt. 41-1, and thus the Court need not consider the testimony.

Even giving Panarello the benefit of the doubt, and drawing all inferences in her favor, she has failed to carry her burden of identifying evidence that would permit a reasonable jury to find that Park Police's stated reasons for not selecting her for one of the two command positions in April 2010—or for taking any action that may have influenced that decision—was pretextual and that the actual reason was motivated by sex discrimination or retaliation.[8] *Adeyemi*, 525 F.3d at 1226. The Department is, therefore, entitled to summary judgment on this claim as well.

## CONCLUSION

The Court will, accordingly, **GRANT** the Department's motion to dismiss and/or for summary judgment with respect to all of Panarello's claims.

A separate order will issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: May 30, 2017

---

*See* Fed. R. Civ. P. 56(c)(4). Moreover, even if the Court were to consider the testimony, there is no dispute that Panarello, as the senior officer on the scene, was the "target" of the investigation, and this snippet of testimony would not permit a reasonable jury to find that Stover played a role in instigating the investigation (which Panarello, herself, says was instigated by Sergeant Johnson, Dkt. 39-3 at 7) or in urging the imposition of any particular discipline (which was not even proposed until more than a year after Stover had retired, Dkt. Dkt. 41-4 at 5 (Stover Dep. at 12) (Stover retired in September 2008); Dkt. 39-23 at 2 (Panarello proposed demotion in October 2009).

[8] For the same reasons, the Court further concludes that, even if Panarello had exhausted her failure-to-promote-to-captain claims for the third and fourth captain-level positions, *see supra* Section III.A.1, she has failed to identify evidence that would permit a reasonable jury to find that the Department's stated rationale for not selecting her were pretextual and that the Department's actual reason was either sex discrimination or retaliation for protected EEO activity.